UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| SONDRA COLEMAN, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case no. 4:15cv1564 PLC |
| NANCY A. BERRYHILL,[1] | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Sondra Coleman ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I. *Background and Procedural History*

On February 8, 2012, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income alleging that she was disabled as of October 20, 2011 as a result of "back and neck problems," migraine headaches, degenerative disc disease, anxiety, and depression. (Tr. 52, 237-45, 246-51). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 82-86, 97-98).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).

1

The SSA granted Plaintiff's request for review, and an ALJ conducted hearings on December 2, 2013 and March 18, 2014. (Tr. 43-51). On December 2, 2013, Plaintiff failed to appear for the hearing,[3] and the ALJ proceeded with the vocational expert's testimony. (Id.). The vocational expert stated that Plaintiff was a licensed practical nurse who also had work experience as a certified medical technician and certified nursing assistant. (Tr. 47-48). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience and the following limitations: "able to do light work with no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional stooping, crouching, kneeling and crawling; frequent handling of objects bilaterally; frequent fingering of objects bilaterally; must avoid concentrated exposure to excessive noise…, hazardous machinery,…and unprotected heights." (Tr. 48). The ALJ added that: "The work is limited to simple, as defined in the DOT as SVP levels 1 and 2, routine and repetitive tasks with no strict production quota, with the emphasis being on a per shift rather than a per hour basis." (Id.). The vocational expert testified that such person could not perform Plaintiff's past work, but could perform the jobs of a cashier, inspector/hand packager, and housekeeper. (Tr. 48-49).

When the ALJ added to his hypothetical a limitation to occasional fingering and handling, the vocational expert stated that such individual could perform the jobs of information clerk and cashier, "but in a limited environment, such as parking booths and parking garages where there's not a constant steady stream of customers or cashiering activity." (Tr. 49). The

---

[3] The ALJ issued Plaintiff a notice to show cause for failure to appear, and Plaintiff responded with a letter stating:
> "I. . . first ask you for [] forgiveness for being 15 minutes late for my court hearing. I am sorry we had to pull over because of the pain in my back and the numbness in my left leg. The pain in my back and legs are overwhelming [sic] we had to pull over about every 30 to 45 minutes. We had to pull over 4 times to get the feeling back in my left leg d[ue] to I live in Salem[,] Mo. and it is a 2 hr and 15 minute drive."

(Tr. 188, 190-91).

vocational expert testified that, if the hypothetical individual were further limited to sedentary work, the only available job for such person would be surveillance system monitor. (Tr. 50). Two or more unscheduled absences per month or the need to take two or more unscheduled breaks in a workday would "preclude work at all exertional levels." (Id.).

Plaintiff appeared at the hearing on March 18, 2014 and testified that she was born on February 26, 1972, had completed two years of college, and lived with her twenty-one-year-old son. (Tr. 34-55). The ALJ observed that Plaintiff arrived with a walker, and Plaintiff stated that Dr. David Myers prescribed it for her. (Tr. 35-36). Plaintiff testified that she was currently taking Percocet, morphine, Tramadol, and a muscle relaxer for her back pain. (Tr. 36). She also took Prozac, valium, and Depakote. (Tr. 38). Plaintiff rated her average pain level at six out of ten, and she had last seen her doctor at the pain clinic the previous day. (Tr. 37, 38).

Plaintiff testified that she suffered a migraine "at least every other week." (Tr. 38). Plaintiff's migraines generally lasted "about a day, day-and-a-half, but the aftermath is about two days." (Tr. 40). When experiencing a migraine, she would take medicine, "[t]hrow a pack of ice on my head, make sure it's dark in the room, no noise." (Id.). When she was able to "catch [the migraine] soon enough" and take her medication, her migraine would subside about six hours later. (Tr. 40-41). Plaintiff explained, "if I [sic] keep getting stronger and overtime, Dr. [Choudhary] does a spinal tap . . . and pulls the fluid off." (Tr. 41).

Plaintiff testified that she had difficulty dressing and bathing herself, but stated she was able to do so "as long as I'm hanging on." (Tr. 38-39). Plaintiff last drove her car about two months prior. (Tr. 39). She was able to do "a little" housework, such as dusting and laundry, but a caregiver did her dishes. (Id.). Plaintiff explained that a caregiver, provided by Disabled

3

Citizens Alliance, Inc., came to her house five days per week for two and a half to three hours. (Tr. 40).

In a decision dated May 28, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920[4] and determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from October 20, 2011, through the date of this decision[.]" (Tr. 10-22). The ALJ found that Plaintiff had the following severe impairments: disorder of the back; migraine; carpal tunnel syndrome; anxiety; and depression. (Tr. 12).

After reviewing Plaintiff's medical records and testimony, the ALJ found that "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 15). The ALJ determined that Plaintiff had the residual functional capacity (RFC) to:

> Perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot climb ladders, ropes, or scaffolds. She can occasionally climb ramps or stairs. She can occasionally stoop, crouch, kneel, or crawl. She can handle objects, that is gross manipulation, bilaterally and on an occasional basis. She can finger, that is fine manipulation of items no smaller than a paper clip, bilaterally on an occasional basis. She must avoid concentrated exposure to excessive noise. She must avoid all use of hazardous machinery and all exposure to unprotected heights. Her work must be limited to simple, as defined by the DOT as SVP levels 1 and 2, routine tasks, and repetitive tasks. She cannot be subject to strict production quotas; the emphasis must be on a per shift rather than per hour basis.

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

(Tr. 14). The ALJ concluded that Plaintiff could not perform past relevant work, but she could perform the jobs of information clerk or "cashier II in a limited environment such as parking garages[,]" and was, therefore, not disabled. (Tr. 21-22).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on August 10, 2015. (Tr. 30, 1-6). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that

a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. *Discussion*

Plaintiff claims that substantial evidence does not support the ALJ's determination of her RFC because the ALJ: (1) improperly weighed the medical opinion evidence; and (2) failed to consider Plaintiff's need for an assistive device. (ECF No. 18). In response, Defendant asserts that the ALJ properly considered the medical opinion evidence and adequately accounted for Plaintiff's credible limitations in determining her RFC. (ECF No. 23).

*A. Medical opinion evidence*

Plaintiff argues that, in creating her RFC, the ALJ erred in assigning too little weight to the opinion of her primary care physician, Dr. David Myers, and too much weight to that of Dr. Nancy Ceaser, a non-examining state agency consultant. Defendant counters that the ALJ provided good reason for assigning Dr. Myer's opinion limited weight and properly assigned significant weight to Dr. Ceaser's opinion.

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), 416.927(c). Because the ALJ weighs each medical opinion in light of the entire record, the Court will summarize the relevant medical evidence.

Plaintiff's voluminous medical records reflect that, in April 2007, when she was thirty-five years of age, a drunk driver struck her vehicle head-on. (Tr. 628-31). An ambulance

transported Plaintiff to an emergency room, where doctors treated her for spinal pain, a closed head injury, and a right foot fracture. (Id.). Plaintiff remained hospitalized for two days. (Id.).

The earliest record of Dr. Myers' treatment relationship with Plaintiff is dated October 8, 2009. (Tr. 463). In progress notes from that visit, Dr. Myers noted that he was treating Plaintiff with regard to back pain, migraines, bilateral ear pain, and anxiety. (Id.). The same month, Plaintiff began seeing Dr. Akhtar Choudhary at Rolla Neurology Pain & Sleep Center for treatment of headaches, as well as episodic numbness and tingling in her hand. (Tr. 420-22). An MRI dated October 27, 2009, revealed: "C5-6 small right central zone disc protrusion and annular tear without neural impingement," and "[a]t C4-5 small central zone disc protrusion with annular tear also without vertebral canal stenosis." (Tr. 489). Plaintiff received a left occipital nerve block the same day. (Tr. 489-92).

The record reflects that Dr. Myers saw Plaintiff three more times in 2009. (Tr. 463, 462, 484). In 2010, Dr. Myers saw Plaintiff at least once a month for migraines, back pain, leg pain and swelling, depression, and anxiety. (Tr. 461, 460, 459, 397, 458, 457, 456, 455). During this time, Dr. Myers repeatedly performed "OMT therapy" and variously prescribed Zofran, Toradol, Vicodin, Depakote, ibuprofen, Chantix, Soma, Xanax, Seroquel, and Phenergan. In addition to the medications prescribed by Dr. Myers, Plaintiff received epidural steroid injections at the Rolla Neurology Pain & Sleep Center in December 2009, January 4, 2010, and March 2, 2010. (Tr. 481-83, 484-86, 478-80).

In March 2010, Plaintiff began seeing Dr. Wade Ceola at the Springfield Neurological & Spine Institute. (Tr. 477-80). At an appointment with Dr. Ceola on November 22, 2011, Plaintiff reported that her back pain was "progressing" and she was "'more klutzy and falling a lot'" because "her leg goes numb or just doesn't work." (Tr. 557).

Plaintiff continued seeing Dr. Myers on a monthly basis in 2011. (Tr. 454, 453, 452, 451, 450, 532, 531). Plaintiff consistently complained of back pain, migraines, leg pain, depression, and anxiety. (Id.). In addition, Plaintiff underwent spinal taps in January and April 2011 and epidural steroid injections in May and July 2011. (Tr. 392, 428-32, 469-70, 466-67).

An MRI on April 20, 2011 revealed "post left L4 hemilaminectomy and microdis[c]ectomy with contrast enhancement adjacent to the left L5 nerve root in lateral recess. No recurrent disk herniation. No impingement. Plain films show degenerative disc disease at L4-5." (Tr. 471). A November 2011 electrophysiological study was "abnormal" and "consistent with bilateral peroneal neuropathy which is axonal in nature" and "findings also suggestive of carpal tunnel in right hand which is mild in nature." (Tr. 411). Electrodiagnostical testing in December 2011 revealed normal lower extremity sensory and motor nerve conductions. (Tr. 552-53). However, a lumbar myelogram and CT lumbar spine with contrast revealed "[d]egenerative dis[c] disease L4-5 with left central zone dis[c] extrusion, which impinges the left L5 nerve root. Dis[c] extrusion migrates caudally in the left lateral recess for 7 mm." (Tr. 554-55).

Plaintiff continued to see Dr. Myers for monthly check-ups and prescription refills in 2012. (Tr. 618-23). On February 13, 2012, Dr. Myers completed a medical source statement (MSS) for Plaintiff. (Tr. 522-23). In the checklist form, Dr. Myers opined that Plaintiff was able to: occasionally lift less than five pounds; stand and/or walk for less than fifteen minutes at a time and less than one hour in an eight-hour day; and sit for less than fifteen minutes at a time and less than one hour in an eight-hour day. (Tr. 522). Dr. Myers also noted that: Plaintiff's ability to push and/or pull was limited; Plaintiff could never climb, balance, stoop, kneel, crouch, or crawl; and Plaintiff could occasionally reach and handle. (Tr. 522-23). Finally, Dr. Myers

stated that, in an eight-hour workday, Plaintiff's pain would require her to lay down twice for approximately thirty minutes. (Tr. 523).

On March 29, 2012, Dr. John Demorlis examined Plaintiff at the request of the SSA. (Tr. 539-45). Dr. Demorlis tested Plaintiff's ranges of motion and grip strength, and he determined they were normal. (Tr. 540-41, 545). Dr. Demorlis noted that: Plaintiff wore braces on her right ankle, left knee, and back; her left calf showed mild atrophy; and her gate was normal. (Tr. 542, 545). In regard to Plaintiff's mental status, he observed: "She cries a lot, false smile, very tremulous, wrings her fingers all the time, looks at you buggy eyed and she is impoverished. She has a hopeless feeling. Appropriate for amount of education." (Tr. 545).

On April 12, 2012, Dr. Nancy Ceaser, a state agency consulting physician, completed an RFC assessment based on Plaintiff's medical records. (Tr. 60-63). Dr. Ceaser found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the medical evidence and deemed Plaintiff "partially credible." (Tr. 60). Dr. Ceaser gave Dr. Myers' MSS "little weight due to lack of objective findings to explain limitations." (Tr. 60-61). According to Dr. Ceaser, Plaintiff was able to: occasionally lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; and stoop, kneel, crouch, and crawl occasionally. (Tr. 61-62). Dr. Ceaser found no manipulative and few environmental limitations. (Tr. 62).

On April 25, 2012, Dr. Myers wrote a letter to the SSA "to support the total disability of [Plaintiff]." (Tr. 547). Dr. Myers stated that Plaintiff had the diagnoses of: bi-polar with manic depression and suicidal thoughts; lumbar disc displacement with two lumbar laminectomies; lumbosacral radiculopathy; migraine headaches; and left calf muscle atrophy. (Tr. 547). He

further noted that Plaintiff was unable to sit or stand for more than one hour at a time in an eight-hour workday and could lift or carry no more than five pounds. (Id.).

In April 2012, Plaintiff complained to Dr. Myers of pain in her left hip and left leg. (Tr. 623). A June 25, 2012 x-ray of her left hip was unremarkable and an x-ray of her lumbar spine showed degenerative changes at L4-5. (Tr. 613-14). In August 2012, Dr. Myers noted that Plaintiff was seen at the Advance Pain Center in Farmington, MO and received an occipital nerve block. (Tr. 620). Dr. Sangmin Ahn at the Advance Pain Center prescribed Plaintiff hydrocodone-acetaminophen and Lorcet. (Tr. 736).

On September 7 and 27, 2012 and October 17, 2012, Dr. Ahn administered epidural steroid injections. (Tr. 727-29, 712-14, 708-11). A September 2012 x-ray of Plaintiff's cervical spine was normal, and an October 2012 MRI cervical spine revealed "[e]ccentric right C4-5 and C5-6 disc/osteophyte protrusion without direct cord impingement" and "[m]ild C4-5 and C5-6 neuroforaminal stenosis." (Tr. 732, 731). On October 22, 2012, Plaintiff informed Dr. Myers that her left leg was causing her to fall, and he prescribed a walker. (Tr. 619).

Plaintiff received a paravertebral facet joint/nerve injection on October 31, 2012, and she underwent a spinal tap on November 1, 2012 and an epidural blood patch procedure on November 5, 2012. (Tr. 707, 611, 605-07). Dr. Ahn administered three nerve block injections at the L3-4, L4-5, and L5-S1 levels on November 16, 2012 and December 5, 2012. (Tr. 701, 696).

On December 9, 2012, Plaintiff presented to the emergency room at Salem Memorial Hospital where she complained: "Last night I tripped and fell and hit my right toes on my walker. Been hurting since and they are bruised. I just couldn't take the pain anymore." (Tr. 561). X-rays of Plaintiff's right foot were normal. (Tr. 566). Plaintiff reported her fall to Dr.

Choudhary on December 14, 2017. (Tr. 618). On December 17, 2017, Dr. Ahn noted that Plaintiff's gait was normal. (Tr. 691).

Plaintiff continued seeing Dr. Myers on an almost monthly basis for check-ups and prescription refills in 2013.[5] (Tr. 616-618, 743, 774). In January 2013, the Disabled Citizens Alliance for Independence began providing Plaintiff a home healthcare aide. (Tr. 364-70). On January 11, 2013, Dr. Choudhary noted that Plaintiff's gait was normal and that she deferred injections because they "did not help." (Tr. 686-88). On February 8, 2013, Plaintiff informed Dr. Abdul Naushad at the Advance Pain Center that her pain was an eight and the medications were helping. (Tr. 680). On April 8, 2013, Dr. Naushad noted that Plaintiff "admits…walking aid" and exhibited "mild antalgia, difficulty getting from sit to stand." (Tr. 675). Plaintiff deferred injections again on July 3, 2013 because she was "afraid." (Tr. 663-67).

On June 17, 2013, Plaintiff informed Dr. Choudhary that her headaches were worsening, and he performed a spinal tap. (Tr. 599-602). On July 19, 2013, Plaintiff informed Dr. Choudhary that the spinal tap had helped "some" and the "medications are helping her and her headaches are manageable." (Tr. 633). On July 29, 2013, Dr. Ahn noted "mild antalgia, difficulty getting from sit to stand." (Tr. 660).

During an appointment with Dr. Myers on August 5, 2013, Plaintiff reported severe pain "to lumbar and down," numbness in her left leg, and swelling to the lower extremities. (Tr. 743). Plaintiff received an epidural steroid injection at the Advance Pain Center on August 7, 2013. (Tr. 761-62). On August 14, 2013, Dr. Myers completed a pain questionnaire about Plaintiff's condition, in which he stated that Plaintiff's pain was credible and Plaintiff: suffered degenerative disc disease of the cervical and lumbar spine; cooperated with treatment/efforts to relieve pain; and was unable to work due to her pain. (Tr. 626). Dr. Myers opined that Plaintiff

---

[5] It appears that Plaintiff did not see Dr. Myers in either July or December 2013.

would miss an average of fifteen to eighteen days of work per month due to debilitating pain. (Id.).

On August 14, 2013, Plaintiff informed Dr. Choudhary that the "[m]edications are helping her but her headaches are not well controlled" and her back pain had "increased progressively." (Tr. 643). Plaintiff also reported numbness in her left leg and "feeling her legs [sic] going to give up and she is going to fall." (Id.). At an appointment with Dr. Choudhary on Monday, August 19, 2013, she reported that the "pain is manageable 'sometimes' with medications, other times it is just 'locked up' and she 'goes down'" and she "has stumbled and caught herself multiple times." (Tr. 772). On August 23, 2017, Dr. Choudhary completed a migraine questionnaire about Plaintiff's condition stating that: Plaintiff's "headache increased progressively and claiming headache almost every day"; "medication helping her but she is claiming her headache not well controlled"; Plaintiff was compliant with treatment; and whether Plaintiff was able to function in a work setting was "unknown." (Tr. 648).

Dr. Ahn administered an occipital nerve block on August 23, 2013. (Tr. 757-59). On August 26, 2013, Dr. Ahn noted that Plaintiff was "waiting to have MRI neck then to be referred to surgeon as injections did not help." (Tr. 753). When Plaintiff saw Dr. Myers on September 12, 2013, she reported severe pain in her lower back down to her left hip, numbness and swelling in her left leg and foot, and severe head and neck pain. (Tr. 743). On September 17, 2013, Plaintiff informed Dr. Choudhary that she had fallen five times since she had last seen him. (Tr. 770). Her most recent fall was the previous day at the Dollar General Store. (Id.). Plaintiff believed the spinal tap of June 2013 had helped "some" and "she is only getting full blown migraines 1-2 times weekly." (Tr. 770). Plaintiff also reported increased numbness and tingling in her hands, and Dr. Choudhary prescribed wrist braces. (Tr. 770-71).

Dr. Thomas Spencer performed a psychological evaluation for Plaintiff on September 19, 2013. (Tr. 764-68). Plaintiff informed Dr. Spencer that her pain on an average day was an 8/10, even with medications, and a home healthcare aide helped Plaintiff dress and bathe, and Plaintiff was "prone to falls because her back locks up". (Tr. 764). Plaintiff's depressive episodes "can last weeks, during which she remains in bed and sleeps off and on" and experiences "recurrent thoughts of suicide." (Tr. 765). Dr. Spencer found Plaintiff "overly dramatic with the tears, affect, etc." and noted that she ambulated without assistance. (Tr. 766).

Plaintiff returned to the Advance Pain Center on September 23, 2013 and reported a slight increase in pain since her last visit and use of a walking aid. (Tr. 749-52). Dr. Ahn noted that a recent MRI of Plaintiff's cervical spine "showed worsening C5-C6 disc herniation" and a "referral to neurosurgeon pending as injections in neck no help at this time." (Tr. 752). Plaintiff saw Dr. Ahn again on October 25, 2013 and reported that she "saw surgeon and states that to have NCS regarding left arm pain." (Tr. 748). On November 22, 2013, Dr. Ahn noted that Plaintiff's pain was an eight and gait was normal, and on December 22, 2013, Plaintiff was "crying and stating tired of pain." (Tr.786-89, 781-84). At a follow-up appointment with Dr. Choudhary on December 27, 2013, she reported three falls since the last visit. (Tr. 792). Plaintiff's back pain was 9/10 and her headache was 4/10. (Id.).

Plaintiff reported to Dr. Myers' office on January 2, 2014 for a refill on her migraine medication. (Tr. 774). Plaintiff reported severe pain from her lower back down to her legs, and numbness in her left foot. (Id.). On January 20, 2014, Plaintiff saw a nurse practitioner in Dr. Choudhary's office and reported that her pain was a 6/10, medication was helping, and her neurologist recently increased her gabapentin. (Tr. 776-80).

At the ALJ's request, Dr. Spencer performed a second psychological evaluation and completed a mental MSS for Plaintiff on April 20, 2014. (Tr. 799-802, 795-798). On the day of her evaluation, Plaintiff "ambulated with a cane" and "said without a cane or a walker, she cannot get around and is prone to falling." (Tr. 799). Plaintiff informed Dr. Spencer that, on an average day, her pain was a seven or eight with treatment, she had difficulty sleeping, and a home health aide assisted her with bathing and dressing. (Tr. 799-800).

*1. Dr. Myers' opinion*

"The opinion of a treating physician is accorded special deference under the social security regulations." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Indeed, "[t]he ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848-49 (8th Cir. 2007)). See also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "'Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.'" Id. at 1132 (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, he or she must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's

14

evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Anderson v. Barnhart, 312 F.Supp.2d 1187, 1194 (E.D. Mo. 2004). See also Tilley v Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

Dr. Myers, Plaintiff's primary care physician, had been treating Plaintiff on a monthly basis for over two years when he completed a checklist-form MSS for Plaintiff in February 2012. (Tr. 522-23). On the form, Dr. Myers noted that Plaintiff was limited to: occasionally lifting less than five pounds; standing and/or walking for less than fifteen minutes at a time and less than one hour in an eight-hour day; and sitting for less than fifteen minutes at a time and less than one hour in an eight-hour day. (Tr. 522). In addition, Dr. Myers stated that Plaintiff must avoid any exposure to "environmental factors" and that her pain required her to lie down or recline two times for approximately thirty minutes during an eight-hour day. (Tr. 523). In an April 2012 letter to the SSA, Dr. Myers reiterated his opinion that Plaintiff was unable to sit or stand for more than one hour at a time and could lift or carry no more than five pounds. (Tr. 547). Over one year later, in August 2013, Dr. Myers completed a pain questionnaire in which he stated that Plaintiff's complaints of pain were credible and her pain prevented her from working. (Tr. 626).

In his decision, the ALJ acknowledged that a treating physician's opinion is generally entitled to substantial weight, but he assigned Dr. Myers' medical opinion "limited weight." (Tr. 19). The ALJ concluded:

> Dr. Myers' opinions stand alone with limitations that were not mentioned in Dr. Myers' numerous records of treatment and are not supported by objective testing or reasoning which would indicate why the claimant's functioning need be so restricted. Moreover, the opinions of Dr. Myers' consists primarily of a

15

standardized, check-the-box form in which he failed to provide supporting reasoning or clinical findings, which renders his opinions less persuasive. Additionally, Dr. Myers' pattern of treatment of the claimant was generally conservative without escalating modalities and his physical examinations of the claimant do not support the opined limitations.

(Tr. 19-20).

The ALJ's conclusory observations that Dr. Myers' opinion were not supported by either his treatment notes, objective testing, or Plaintiff's treatment history, did not adequately explain his reasons for discrediting Dr. Myers' opinions. The ALJ failed to identify the objective medical evidence or inconsistencies that he relied upon in determining that Dr. Myers' opinion was not entitled to controlling, or even substantial, weight.

Contrary to the ALJ's finding that Dr. Myers' opinion was inconsistent with the record as a whole, Plaintiff's medical records are replete with consistent complaints of chronic back pain, headaches, migraines, numbness and swelling of her legs, and numbness and tingling in her hands. Plaintiff received numerous epidural steroid injections, nerve blocks, and spinal taps. Both Dr. Myers and Dr. Choudhary noted that Plaintiff had reported falling and, in December 2012, she went to the ER after tripping and hitting her toes on her walker. While various doctors observed that Plaintiff's gait was normal, Plaintiff's 2013 records from the Advance Pain Center reflect that her gait was antalgic and she admitted using a walking aid. Additionally, the testimony and medical records reveal that Plaintiff began receiving the assistance of a home healthcare aide in January 2013. The Court finds that substantial evidence supports Dr. Myers' opinion that her impairments caused her continuing and debilitating pain.

To the extent the ALJ discounted Dr. Myers' opinion because his treatment notes did not reflect his opined restrictions, "[i]t does not seem unusual that a physician would see no need to make specific treatment notes on an unemployed patient's need for work [restrictions] during a

routine medical examination." Leckenby v. Astrue, 487 F.3d 626, 633 n.7 (8th Cir. 2007). Furthermore, Dr. Myers' treatment notes, though generally brief and difficult to read, reveal that, in an effort to alleviate Plaintiff's pain, he regularly prescribed different combinations and dosages of medications. Dr. Myers' notes also reflect that he prescribed Plaintiff a back brace in April 2011 and a walker in October 2012 because her left leg pain was causing her to fall.

While, as the ALJ correctly noted, Dr. Myers used a "standardized, check-the-box form in which he failed to provide supporting reasoning or clinical findings," the Eighth Circuit has "never upheld a decision to discount an MSS on the basis that the 'evaluation by box category' is deficient *ipso facto*." Reed, 399 F.3d at 921. More importantly, although not specifically cited by Dr. Myers, Plaintiff's medical records contain significant objective evidence supporting his opinions. For example, in December 2011, a lumbar myelogram and CT with contrast revealed "[d]egenerative disk disease L4-5 with left central zone disk extrusion, which impinges the left L5 nerve root." (Tr. 554-55). An MRI of Plaintiff's cervical spine performed in October 2012 revealed "[e]ccentric right C4-5 and C5-6 disc/osteophyte protrusion without direct cord impingement" and "[m]ild C4-5 and C5-6 neuroforaminal stenosis." (Tr. 732, 731). In September 2013, Dr. Ahn, a pain specialist, noted that Plaintiff's recent MRIs revealed "worsening C5-C6 disc herniation." (Tr. 752).

"Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." Papesh, 786 F.3d at 1132 (quoting Samons, 497 F.3d at 818). Dr. Myers' opinion about the severity and debilitating affects of Plaintiff's impairments is consistent with, or at least not in conflict with, his own treatment notes, the treatment records of Plaintiff's specialists, and Plaintiff's testimony about

17

her own symptoms. For these reasons, the ALJ's decision to discount Dr. Myers' opinion is not supported by substantial evidence.

*2. Dr. Ceaser's opinion*

Plaintiff also challenges the ALJ's grant of "significant" weight to the opinion of Dr. Ceaser, a non-examining state agency consultant. Opinions of non-examining sources are generally given less weight than those of examining sources. Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010). When evaluating the non-examining source's opinion, the ALJ should evaluate the degree to which the opinion considers all of the pertinent evidence in the claim, including the opinions of treating and other examining sources. Id. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003).

Based upon her review of Plaintiff's medical records through early 2012, Dr. Ceaser found that Plaintiff's account of her pain and physical limitations were only "partially credible" and that Plaintiff could: occasionally lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; and stoop, kneel, crouch, and crawl occasionally. (Tr. 61-62). Dr. Ceaser found no manipulative and few environmental limitations. (Tr. 62).

In formulating Plaintiff's RFC, the ALJ assigned the most weight to Dr. Ceaser's medical opinion. The ALJ credited Dr. Ceaser's opinion because, "[a]s a state agency consultant, Dr. Caeser [sic] is familiar with the disability determination process and the regulations[,]" she is a medical doctor with "specialized training and expertise that make her eminently qualified to

render the foregoing opinion[,]" and she based her opinion "upon a comprehensive review of the record, including the claimant's longitudinal medical history and self-reported daily activities." (Tr. 18-19). The ALJ found that Dr. Ceaser's opinions "were generally consistent with the medical evidence of record, which supports a conclusion that the claimant could perform a light exertional range of work, throughout the relevant period." (Tr. 19). Acknowledging that "subsequent evidence of record suggests a greater or lesser degree of limitation with some of the postural and environmental limitations," the ALJ assigned Dr. Ceaser's opinion "significant, but not full, weight." (Id.).

The ALJ's decision provides no support for his conclusion that Dr. Ceaser's opinions "were generally consistent with the medical evidence of record." Contrary to the ALJ's conclusory finding, the medical records upon which Dr. Ceaser purportedly based her opinion reflected significant physical limitations and contained no evidence to support her conclusions that Plaintiff could frequently climb ramps and stairs and occasionally climb ladders, ropes and scaffolds. Furthermore, Dr. Ceaser based her opinion on the records of Plaintiff's treatment through April 2012 and the ALJ did not issue his decision until May 2014. Based on the above, the Court finds that the ALJ erred in granting more weight to the opinion of a non-examining consulting physician than Plaintiff's long-time treating physician.

### B. Plaintiff's assistive device

Relatedly, Plaintiff argues that the ALJ erred in not including her need for an assistive device in the RFC. (ECF No. 18 at 19-21). Defendant counters that the ALJ did not err in failing to include Plaintiff's use of a cane or walker because the evidence did not support the need for additional limitations on ambulation. (ECF No. 23 at 8).

Because the ALJ will need to reassess all of the evidence on remand, the Court need not address Plaintiff's remaining argument. However, on remand, the ALJ should discuss Plaintiff's alleged need for an assistive device when he evaluates the medical evidence and formulates the RFC.

## IV. *Conclusion*

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

／s／ Patricia L. Cohen
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of May, 2017